**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Kimberly R. Sweidy, | ) | No.  CV-21-08013-PHX-SPL |
| | ) | |
| Plaintiff, | ) | **ORDER** |
| vs. | ) | |
| | ) | |
| Spring Ridge Academy, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Before the Court are two Motions for Summary Judgment, filed by the various Defendants in this action. First, Defendant Veronica Borges moves for summary judgment on all claims asserted against her by Plaintiff Kimberly R. Sweidy ("Plaintiff"). (Doc. 113). Second, Defendants Spring Ridge Academy ("SRA"), Jean Courtney, Suzanne Courtney, Brandon Courtney, Erin Smith, Leslie Filsinger, Justin Zych, and Kate Deily move for summary judgment in their favor on all claims asserted against them. (Doc. 115). The Motions are fully briefed and ready for review.[1] (Docs. 113, 154, & 160; 115, 152, & 161). The Court's ruling is as follows.[2]

---

[1] Because it would not assist in resolution of the instant issues, the Court finds the pending Motions suitable for decision without oral argument. *See* LRCiv. 7.2(f); Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

[2] The Court understands that it previously struck Plaintiff's Statements of Fact (Doc. 151). However, upon review of the parties' briefing and in the interest of justice, the Court has taken into consideration the exhibits attached to those Statements of Fact, despite Defendants' request to the contrary.

## I.    **BACKGROUND**

Plaintiff brings this suit against SRA and eight of its individual employees. (*See* Doc. 1 at 1). Her claims arise out of her Daughter's ("Plaintiff's Daughter") enrollment at SRA, a therapeutic[3] boarding school for girls in Mayer, Arizona. (Doc. 155 at 2). According to the Complaint, Defendant Jean Courtney and her then-husband David Gilcrease founded SRA in 1996. (Doc. 1 at 4–5). Defendant Suzanne Courtney is the Executive Director for SRA and "the SRA go-between that monitors communication between parents and their children who are enrolled at SRA." (*Id.* at 7–8). Suzanne Courtney is married to Defendant Brandon Courtney, who is SRA's President/CEO and Program Director, and Jean Courtney's son. (*Id.* at 8). Defendant Erin Smith "has the title of Director of Operational Excellence at SRA" and has a background in education. (*Id.*). Defendant Leslie Filsinger is the Clinical Director for SRA. (*Id.* at 9). As the lead member of all therapeutic teams, Filsinger oversees, authorizes, and approves all SRA treatment plans and therapeutic decision-making. (*Id.*). Filsinger has been a Licensed Professional Counselor in Arizona since 2014. (*Id.*). Defendant Justin Zych has served as SRA's Principal since approximately June 2019. (*Id.* at 9–10). Defendant Kate Deily is the Admissions Director for SRA. (*Id.* at 10). Finally, Defendant Veronica Borges is listed as a Therapist with SRA, despite the fact that she is not licensed as a therapist by Arizona's Board of Behavioral Health Examiners. (*Id.*).

Plaintiff's Daughter was enrolled at SRA on December 12, 2019, approximately two years after the divorce of her parents, Plaintiff and Mr. Raymond Stata. (Docs. 153 at 2 & 155 at 2–3). As part of the enrollment process, Plaintiff signed the "Enrollment Terms and Agreement" (the "Enrollment Agreement") (Doc. 1 at 127–38) and received the "Parent Manual" (Doc. 1 at 140–72), documents that together comprise the parties' contract for purposes of this action. Between January 22–24, 2020, Plaintiff attended the Parent Challenge, a three-day workshop where she alleges that she was introduced to the

---

[3] The Court notes Plaintiff's contention that SRA is merely *advertised* as a therapeutic boarding school. (Doc. 155 at 2).

"controversial methods" used at SRA. (*Id.* at 14–15). Following the Parent Challenge, Defendant Borges sent Plaintiff the "Master Treatment Plan" that had been developed for her Daughter. (*Id.* at 23). On January 25, 2020, Plaintiff and her Daughter were allowed to leave the SRA campus for approximately 24 hours. (*Id.* at 25). Over dinner, Plaintiff alleges that she and her Daughter were finally able to "speak freely" and that her Daughter described to Plaintiff "a series of disturbing events that had occurred since her enrollment at SRA." (*Id.*). This included, among other things, Plaintiff's Daughter's severe illness that caused her to miss two weeks of school and which Plaintiff had never been informed of. (*Id.* at 26). On January 26, 2020, Plaintiff's Daughter was returned to SRA and Plaintiff returned home to California where she began looking into the SRA program and the Master Treatment Plan. (*Id.* at 30). Over the following week, Plaintiff corresponded with Defendants and inquired into the SRA program. (*Id.* at 30–36).

On February 3, 2020, Plaintiff—who had growing concerns over what her Daughter was experiencing at SRA—returned to SRA, accompanied by two Yavapai County Sheriffs, and removed her Daughter from the campus. (*Id.* at 35–36). Over the following nine days, Plaintiff alleges that SRA and Mr. Stata sought to force the return of Plaintiff's Daughter to SRA. (*Id.* at 36–39). On February 12, 2020, Plaintiff's Daughter was ordered by a California Family Law Judge—who had been petitioned by Mr. Stata—to return to SRA. (*Id.* at 39). On February 25, 2020, Plaintiff received a letter from SRA outlining new protocols in light of her temporary removal of her Daughter. (*Id.* at 40–41). The letter stated, among other things, that SRA would no longer provide therapeutic services involving Plaintiff and that she would only be allowed to communicate with her Daughter via SRA-monitored writing and telephone communications. (*Id.*). Over the following five months, Plaintiff's contact with her Daughter was limited. (*See id.* at 42–69). Plaintiff also alleges that her requests that her Daughter be allowed to return home due to the COVID-19 pandemic were denied. (*Id.* at 41–42). Plaintiff's concerns over the therapeutic and educational services her Daughter was receiving increased. (*See id.* at 42–69). On June 25, 2020, Plaintiff asked the Family Law Court to order the return of her Daughter to

California. (*Id.* at 68). To address any concerns over parental conflict—given Mr. Stata's consistent position that their Daughter remain at SRA—Plaintiff offered to give up all legal and physical custodial rights so long as her Daughter be ordered to return home to live with Mr. Stata. (*Id.* at 68–69). Plaintiff's so-called "Hail Mary Play" worked, and her Daughter was ordered to leave SRA and return to California on June 28, 2020. (*Id.* at 69).

On January 21, 2021, Plaintiff filed the present action. According to the Complaint, Plaintiff alleges that SRA uses a variety of seminars, workshops, and residential living conditions to take advantage of a vulnerable population—*i.e.*, divorced parents and their children—and make money. (*Id.* at 14). Plaintiff alleges that SRA does this by using tactics such as public shaming, manipulation and coercion, fear, yelling and violence, disclosure of confidential information, drugs, isolation, and food deprivation. (*Id.*). Such tactics "are designed to destroy the student's faith and relationship [with] the parents and to destroy the parent's faith in themselves, such that the school and its owners, with no credentials whatsoever, have unbridled access and ability to imprison students for an arbitrary and uncertain time period for money." (*Id.* at 14). Plaintiff alleges eight distinct causes of action, each against all named Defendants: (i) actual and constructive fraud; (ii) consumer fraud; (iii) breach of contract/breach of warranty; (iv) breach of the covenant of good faith and fair dealing; (v) violations of the Racketeer Influenced and Corrupt Organization ("RICO") Act, 18 U.S.C. § 1961, *et seq.*; (vi) negligence *per se*; (vii) intentional infliction of emotional distress ("IIED"); and (viii) conversion. (Doc. 1 at 95–123). On January 13, 2023, Defendants filed their Motions for Summary Judgment (Docs. 113 & 115), which are now presently before the Court.

## II.   **LEGAL STANDARD**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Material facts are those facts "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of

material fact arises if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party moving for summary judgment bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material. *Anderson*, 477 U.S. at 250. In other words, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," and, instead, must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

When considering a motion for summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must view the factual record and draw all reasonable inferences in the nonmovant's favor. *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002). The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

**III.   DISCUSSION**

**A. Fraud Claims – Actual, Constructive, and Consumer**

To establish a claim for actual fraud under Arizona law, a plaintiff must prove nine separate elements: "(1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) the speaker's intent that the information should be acted upon by the hearer and in a manner reasonably contemplated, (6) the hearer's ignorance of the information's falsity, (7) the hearer's reliance on its truth, (8) the hearer's right to rely thereon, and (9) the hearer's consequent and proximate injury." *Taeger*

*v. Cath. Fam. & Cmty. Servs.*, 196 Ariz. 285, 294 (Ct. App. 1999). "Constructive fraud, as contrasted to actual fraud, is a breach of legal or equitable duty which, irrespective of the moral guilt or intent of the party charged, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests." *Rhoads v. Harvey Publ'ns, Inc.*, 145 Ariz. 142, 148 (Ct. App. 1984). "Dishonesty of purpose and intent to deceive are not essential elements of constructive fraud." *Id.* (citation omitted). "Where a relation of trust and confidence exists between two parties so that one of them places peculiar reliance in the trustworthiness of another, the latter is under a duty to make a full and truthful disclosure of all material facts and is liable for misrepresentation or concealment." *Id.* at 148–49. "The breach of this duty gives rise to an action in constructive fraud." *Id.* at 149 (citation omitted).

"The Arizona Consumer Fraud Act ("ACFA") broadly prohibits fraudulent, deceptive, or misleading conduct in connection with the sale or advertisement of consumer goods and services." *Cheatham v. ADT Corp.*, 161 F. Supp. 3d 815, 825 (D. Ariz. 2016) (citing A.R.S. § 44-1522(A)). "Arizona courts construe the ACFA to provide a right of action on any person damaged by a violation of the Act." *Id.* (citing *Sellinger v. Freeway Mobile Home Sales, Inc.*, 110 Ariz. 573 (1974)). "To prevail, a plaintiff must establish that (1) the defendant made a misrepresentation in violation of the Act, and (2) defendant's conduct proximately caused plaintiff to suffer damages." *Id.* (citing *Parks v. Macro–Dynamics, Inc.*, 121 Ariz. 517, 520 (Ct. App. 1979)). "It is not necessary for the plaintiff to show that the defendant made an affirmative misstatement." *Id.* "Material omissions are also actionable." *Id.* (citation omitted). "A misrepresentation causes injury where the consumer actually relies on it, but 'unlike common law fraud, this reliance need not be reasonable.'" *Id.* at 825–26 (quoting *Parks*, 121 Ariz. at 520).

As an initial matter, the Court will grant Defendant Borges' request for summary judgment on the fraud claims. Plaintiff's fraud claims are broadly based on her allegation that Defendants fraudulently induced Plaintiff into enrolling her daughter at SRA by concealing and otherwise misrepresenting the true nature of the SRA program. However,

Defendant Borges argues that Plaintiff "admits that she did not meet or even speak to Borges until after [her daughter] was enrolled at SRA" and that Plaintiff therefore cannot show that Defendant made any fraudulent representations that Plaintiff relied upon in enrolling her daughter at SRA. (Doc. 113 at 6–7). Plaintiff does not dispute this in her Response, but rather contends that her fraud claims against Defendant Borges are based on a different theory—that Defendant Borges "concealed essential information regarding [Plaintiff's Daughter's] health and welfare," a misrepresentation which Plaintiff alleges that she relied upon in deciding to keep her Daughter enrolled after she had already begun attending SRA. (Doc. 154 at 3–5).

The Court finds that Plaintiff's alternative theory of fraud does not fit within Arizona's framework for the common law tort of fraud because it does not directly involve a pecuniary or economic loss. "Arizona follows the Restatement (Second) of Torts." *Tavilla v. Cephalon, Inc.*, 870 F. Supp. 2d 759, 774 (D. Ariz. 2012). The Restatement provides that "[o]ne who fraudulently makes a misrepresentation . . . is subject to liability to the other in deceit *for pecuniary loss* caused to him by his justifiable reliance upon the misrepresentation." Restatement (Second) of Torts § 525 (1977) (emphasis added). The alleged harm underlying Plaintiff's theory against Defendant Borges appears to be emotional distress caused to Plaintiff as a result of her being misled into leaving her Daughter enrolled at SRA. The parties do not cite to—and this Court's own research has failed to turn up—any cases in which an Arizona court has permitted solely non-pecuniary, emotional damages in a common law fraud claim. Comment (h) of § 525 of the Restatement recognizes *physical* harm that may result from a misrepresentation, but even then only considers economic loss that derives from that physical harm. *See* Restatement (Second) of Torts § 525, comment (h) (1977) ("This Section [] covers pecuniary loss resulting from a fraudulent misrepresentation, and not physical harm resulting from the misrepresentation. As to the latter, see § 557A, which also covers the economic loss deriving from the physical harm. This type of economic loss is not intended to be included in the term, pecuniary loss, as used in this chapter.").

Plaintiff's ACFA claim against Defendant Borges fails for the same reason. The ACFA prohibits "[t]he act, use or employment . . . of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact . . . *in connection with the sale or advertisement of any merchandise*." A.R.S. § 44-1522(A) (emphasis added). Plaintiff's theory of consumer fraud against Defendant Borges has no connection with the sale or advertisement of any product or service. Plaintiff had already purchased the service—that is, enrolled her daughter at SRA—by the time she met or spoke with Defendant Borges for the first time. Thus, even assuming the truth of Plaintiff's allegation that Defendant Borges concealed from Plaintiff material facts related to her Daughter's health and welfare post-enrollment, Plaintiff has not shown any evidence that such concealment of facts was related to the "sale or advertisement of any merchandise" and her ACFA claim must be dismissed.

Turning to the remaining Defendants, the Court first grants summary judgment on Plaintiff's fraud claims in favor of Defendants Jean Courtney, Suzanne Courtney, Brandon Courtney, Erin Smith, Leslie Filsinger, and Justin Zych. Plaintiff's Response does not contend that any of these Defendants—in their individual capacities—made any misrepresentation or concealment of information prior to Plaintiff's enrollment of her Daughter at SRA. Rather, Plaintiff's Response argues that she relied on pre-enrollment false representations from Defendants SRA and Kate Deily, and that her fraud theory against the *other* Defendants is based on her allegation that they "committed grave omission during the early weeks of her daughter's enrollment by failing to inform [Plaintiff] that her daughter was attending Lifespring-based seminars and that she was emotionally upset, ill and missing class." (Doc. 152 at 7). As discussed above with respect to Defendant Borges, such allegations of misrepresentation and concealment cannot support a claim for fraud under common law or the ACFA because they had nothing to do with Plaintiff's decision to enroll her Daughter at SRA in the first place, *i.e.*, the actionable conduct at issue in this fraud claim. The Court dismisses Plaintiff's claims for common law fraud and for violation of the ACFA against Defendants Jean Courtney, Suzanne Courtney,

Brandon Courtney, Erin Smith, Leslie Filsinger, and Justin Zych.

Second, with respect to Defendants SRA and Kate Deily, the Court finds that a material factual dispute exists as it relates to whether the written materials and express statements that were provided to Plaintiff prior to her Daughter's enrollment contained actionable misrepresentations or concealments of information. Although Defendants argue that the documentation provided to Plaintiff "clearly differentiated between the experiential activities [] and therapy services that SRA provided," (*see* Doc. 115 at 10), Plaintiff's position is that Defendants SRA and Kate Deily misrepresented *numerous* aspects of the SRA program. (*See* Doc. 152 at 3–7). More importantly, Plaintiff has evidence to support her position, including her own testimony as alleged in her Verified Complaint,[4] the documents at issue (namely, the Parent Manual and the Enrollment Terms and Agreement), and the testimony of three experts who opine to issues such as the problems associated with Large Group Awareness Training, what constitutes evidence-based therapy and whether the four therapy modalities used at SRA fell under that category, and whether—in the expert's opinion—the methodologies used at SRA were effective or appropriate. The Court is unpersuaded by Defendants' argument that Plaintiff's fraud claims must be dismissed merely because—in Defendants' view—the documents provided to Plaintiff clearly differentiated SRA's non-therapeutic activities from its therapeutic modalities.[5]

---

[4] As Defendants note in their Reply, (*see* Doc. 161 at 2), a verified complaint *may* be treated as an opposing affidavit, so long as the allegations used are "based on personal knowledge and set[] forth facts admissible in evidence." *McElyea v. Babbitt*, 833 F.2d 196, 198 n.1 (9th Cir. 1987) (citation omitted). Here, the Court finds that Plaintiff could reasonably testify as to her personal knowledge about what she was told or otherwise informed of prior to enrolling her daughter as it relates to the services SRA provides.

[5] The Court notes that Defendants' Motion arguably fails to even meet Defendants' initial burden to identify those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim [] or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire*, 210 F.3d at 1102. Here, Defendants' Motion does not specifically identify the element of fraud that

In the Reply, Defendants argue for the first time that Plaintiff's fraud claims should instead be considered a claim for lack of informed consent. (Doc. 161 at 3). Defendants then argue that Plaintiff fails to offer any expert testimony relating to Defendants' duty to disclose information and to the applicable standard of care, and that the absence of such expert testimony requires dismissal of her informed consent claim. (*Id.*). The Court is unpersuaded. First, Defendants made no mention of this argument in their initial Motion and cannot raise a new argument in the Reply. *See Surowiec v. Cap. Title Agency, Inc.*, 790 F. Supp. 2d 997, 1002 (D. Ariz. 2011) (quotation marks and citations omitted) ("[C]ourts will not consider new arguments raised for the first time in a reply brief."). In contrast, Defendants make a similar argument with respect to Plaintiff's contract claims—arguing that they are better characterized as tort claims—but do so in their Motion rather than waiting until the Reply to make the argument. (*See* Doc. 115 at 11). Second, even if Defendants' informed consent argument is considered to be a permissible response to Plaintiff's Response arguments, the Court must keep its summary judgment analysis within the scope of the claims Plaintiff seeks to bring to trial. Here, Plaintiff did not assert an informed consent claim; rather, she asserted fraud claims. The Court will not speculate as to whether Plaintiff's fraud claims would be more accurately characterized as informed consent claims, nor will it speculate as to whether Plaintiff has sufficient evidence to support an informed consent claim. The remainder of Defendants' Reply arguments generally demonstrate the factual dispute that remains between the parties as it relates to Plaintiff's fraud claims. (*See* Doc. 160 at 3–5). The Court will not dismiss Plaintiff's common law or ACFA fraud claims against Defendants SRA and Kate Deily.

In sum, the Court grants summary judgment to all individual Defendants except for Defendant Kate Deily with respect to Plaintiff's fraud claims under the common law and

---

Plaintiff cannot prove at trial. Rather, Defendants make the conclusory assertion that Plaintiff cannot prove *all nine elements* merely because, in Defendants' view, the pre-enrollment documents provided to Plaintiff "clearly differentiated" between the non-therapeutic activities and the therapeutic modalities. (Doc. 115 at 10 (emphasis added)).

the ACFA. Counts I and II are dismissed against these Defendants. The Court denies summary judgment with respect to Plaintiff's fraud claims under the common law and the ACFA against Defendants SRA and Kate Deily.

## B. Breach of Contract, Warranty, and Implied Covenant Claims

As an initial matter, the Court will grant summary judgment to the individual Defendants on Plaintiff's contract-related claims because the individual Defendants lacked privity to the contract at issue. "Privity is that connection or relationship which exists between two or more contracting parties. It arises from the mere fact of entering into a contract. Generally, privity of contract must exist before one may seek to enforce or defeat the contract." *Mardian Equip. Co. v. St. Paul Fire & Marine Ins. Co.*, No. CV-05-2729-PHX-DGC, 2006 WL 2456214, at *2 (D. Ariz. Aug. 22, 2006) (quotation marks omitted) (citing *Samsel v. Allstate Ins. Co.*, 199 Ariz. 480, 484 (Ct. App. 2001)); *see also Hayden Bus. Ctr. Condos. Ass'n v. Pegasus Dev. Corp.*, 209 Ariz. 511, 514 (Ct. App. 2005) ("Time after time, however, Arizona courts have insisted on privity for breach of contract claims."); *Treadway v. W. Cotton Oil & Ginning Co.*, 40 Ariz. 125, 138 (1932) ("[A]s a general rule only the parties and privies to a contract may enforce it.").

Here, the contract at issue is the Enrollment Agreement signed by Plaintiff in December 2019. (*See* Doc. 114-1 at 2–6). The first page identifies the "Sponsors" as the parents of Plaintiff's daughter, *i.e.*, Raymond P. Stata and Plaintiff. (Doc. 114-1 at 2). The same page then expressly states that "[t]his Enrollment Agreement, *by and between Spring Ridge Academy* [] *and the Sponsor(s)* is made under the following agreements." (*Id.* (emphasis added)). The Enrollment Agreement makes no explicit mention of the individual Defendants in this case—Veronica Borges, Jean Courtney, Suzanne Courtney, Brandon Courtney, Erin Smith, Leslie Filsinger, Justin Zych, and Kate Deily. Thus, these individual Defendants were not parties to the contract and cannot be sued for breaching it.

In support of her claim for breach of the implied covenant of good faith and fair dealing, Plaintiff points to a provision from the Enrollment Agreement stating that "SRA and its staff operate in [sic] behalf of, and as agents for, the Sponsor(s)." (Doc. 1 at 127).

Plaintiff argues that this provision formed an agency relationship and thereby created "an implied contract with [P]laintiff obligating each of [the individual Defendants] to deal with [Plaintiff] in good faith." (Docs. 154 at 7 & 152 at 8). Plaintiff further contends that the individual Defendants' roles as family therapists for Plaintiff created a "special relationship" as a matter of public policy. Given these fiduciary and/or special relationships, Plaintiff argues that "[t]he proper inquiry is whether a sufficient relationship exists between the parties to make it reasonable, as a matter of public policy, to impose a duty." (Doc. 152 at 8). Plaintiff's position appears to be that the individual Defendants can be held liable in contract for breach of the implied covenant of good faith and fair dealing because they failed to act in accordance with the duties arising from their fiduciary and/or special relationship with Plaintiff.

Plaintiff's argument misses the point. The covenant of good faith and fair dealing arises from a valid contract, *not* from the parties' relationship. *Rawlings v. Apodaca*, 151 Ariz. 149, 153–54 (1986) (citations omitted) (emphasis added) ("The law implies a covenant of good faith and fair dealing in every contract. *The duty arises by virtue of a contractual relationship*. The essence of that duty is that neither party will act to impair the right of the other to receive the benefits which flow from their agreement or contractual relationship.") Even *assuming* that an agency and/or special relationship existed between the individual Defendants and Plaintiff,[6] a breach of the implied covenant nonetheless

---

[6] The Court notes that assuming the existence of an agency relationship is no small assumption. "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." *Goodman v. Physical Res. Eng'g, Inc.*, 229 Ariz. 25, 29 (Ct. App. 2011) (quoting Restatement (Third) of Agency § 1.01 (2006)). In determining whether an agency relationship existed, courts consider the relation of the parties to one another and to the subject matter, as well as their acts and pattern of conduct. *Phx. W. Holding Corp. v. Gleeson*, 500 P.2d 320, 325–26 (Ct. App. 1972).

The Court therefore puts little weight into the labels assigned by the Enrollment Agreement in this case—that is, just because the Enrollment Agreement states that the individual Defendants, as SRA staff members, "operate . . . as agents for" Plaintiff does not necessarily mean an agency relationship existed without any consideration of all the

requires the existence of a valid contract. *See Johnson Int'l, Inc. v. City of Phx.*, 192 Ariz. 466, 473–74 (Ct. App. 1998) (finding that obligation under implied covenant of good faith and fair dealing "presumes the existence of a valid contract"); *Price v. Town of Dewey-Humboldt*, No. CV-12-8086-PCT-FJM, 2012 WL 2415206, at *3 (D. Ariz. June 26, 2012) (noting that covenants of good faith and fair dealing "presume the existence of a valid contract" and finding that plaintiff failed to state claim for breach of those covenants when he failed to allege existence of a valid contract). Here, the fact of the matter is that the Enrollment Agreement was a contract solely between SRA and Plaintiff; the individual Defendants were simply not parties to that contract.

The fact that Plaintiff may bring her implied covenant claim against the individual Defendants in tort rather than in contract changes nothing. To be sure—and unlike with an implied covenant claim sounding in contract—the existence of a "special relationship" is an important consideration in analyzing a tortious implied covenant claim. *See Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Loc. No. 395 Pension Tr. Fund*, 201 Ariz. 474, 490 (2002) (citation omitted) ("A party may bring an action in tort claiming damages for breach of the implied covenant of good faith, but only where there is a 'special relationship between the parties arising from elements of public interest, adhesion, and fiduciary responsibility.'"). However, Plaintiff fails to cite to any cases in which a claim for tortious breach of the implied covenant of good faith and fair dealing was sustained despite the absence of a valid contract in the first place. This Court's own review of the caselaw fails to turn up such a case either. Rather, the caselaw demonstrates that a valid contract is required *regardless* of whether the implied covenant claim is brought in contract or in tort. *See id.* at 490–91 (noting that "[t]here is a difference . . . in the proof required, depending on whether the claim sounds in tort or in contract," but recognizing that duties associated with implied covenant nonetheless "exist[] by virtue of a contract relationship"); *Rawlings*, 151 Ariz. at 158 (citation omitted) (emphasis added) ("[A] tort action for breach

---

other circumstances surrounding the parties' relationship. The parties do not meaningfully discuss the agency issue, and the Court will not consider it any further either.

of the implied covenant is more often recognized where *the contract* creates a relationship in which the law implies special duties not imposed on other contractual relationships. These relationships are 'characterized by elements of public interest, adhesion, and fiduciary relationship.'"); *McAlister v. Citibank*, 171 Ariz. 207, 212–13 (Ct. App. 1992) (citations and alterations omitted) (emphasis added) ("The law implies a covenant of good faith and fair dealing *in every contract*. . . . While the remedy for breach of this implied covenant is ordinarily by action on contract, in certain circumstances 'the breach may provide the basis for imposing tort damages.'").

In essence, Plaintiff's argument seems to conflate her implied covenant claim with a breach of fiduciary duty claim. It may be true that the individual Defendants had a fiduciary relationship with Plaintiff and that they breached that fiduciary duty. Had Plaintiff brought a breach of fiduciary duty claim, this Court's conclusion might be different because the existence of a contract is irrelevant to a breach of fiduciary duty claim sounding in tort. *See Marquette Venture Partners II, L.P. v. Leonesio*, No. 1 CA–CV 09–0166, 2011 WL 1867517, at *9 (Ct. App. Ariz. May 3, 2011) (citing Restatement (Third) of Agency § 1.01 cmt. e, d (2006)) ("'[T]he agency relationship creates the agent's fiduciary obligation as a matter of law.' And, a breach of fiduciary duty is not dependent on a contract."). However, Plaintiff's Complaint does not assert a claim for breach of fiduciary duty. The claim at issue is for breach of the implied covenant of good faith and fair dealing. That claim must be dismissed to the extent it is asserted against the individual Defendants because they were not parties to the Enrollment Agreement. The Court grants summary judgment in favor of the individual Defendants with respect to Plaintiff's contract claims, including her claim for breach of the implied covenant.

In contrast with the individual Defendants, it is undisputed that Defendant SRA was a party to the Enrollment Agreement and thus the requirement of contractual privity is not in question. Instead, Defendant SRA contends that Plaintiff's claims against Defendant SRA sound in tort rather than in contract. (Doc. 115 at 11). Defendant SRA argues that Plaintiff cannot maintain simultaneous tort and contract claims against Defendants under

14

1    Arizona law, and that dismissal of her contract claims is appropriate. (*Id.* at 12–13).

2        In *Collins*, the Arizona Court of Appeals summed up the holdings from *Lewin* and

3    *Barmat*—two relevant cases relied upon by Defendant SRA—as follows:

> We recognize that *Lewin* and *Barmat* are not precisely on point since they were concerned with distinguishing between contract and tort in the context of the statutory provision for attorneys' fees in actions arising out of contract. Nevertheless, they are persuasively instructive on the basic question of whether an action in contract can even be maintained in a malpractice setting. Essentially they teach that *even where there is an express contract between the professional and the client, an action for breach of that contract cannot be maintained if the contract merely requires generally that the professional render services*. Only if there is a specific promise contained in the contract can the action sound in contract, and then only to the extent the claim is premised on the nonperformance of that promise.

13   *Collins v. Miller & Miller, Ltd.*, 189 Ariz. 387, 395 (Ct. App. 1996) (citations omitted)

14   (emphasis added).[7] Having fully reviewed the parties' contract in this case, the Court finds

15   that it merely requires that SRA renders therapeutic and academic services.[8] The terms of

---

17       [7] In *Lewin*, the Arizona Court of Appeals held that:

> [W]here there is a contract for services which places the parties in such a relationship to each other that, in attempting to perform the promised service, a duty imposed by law as a result of the contractual relationship between the parties is violated through an act which incidentally prevents the performance of the contract, then the gravamen of the action is a breach of the legal duty, and not of the contract itself.

*Lewin v. Miller Wagner & Co., Ltd.*, 151 Ariz. 29, 36 (Ct. App. 1986) (citation omitted). In *Barmat*, the Arizona Supreme Court approved *Lewin*'s rationale in holding that "[a]bsent some special contractual agreement or undertaking between those in the professional relationship . . . a professional malpractice action does not 'arise' from contract, but rather from tort." *Barmat v. John & Jane Doe Partners A–D*, 155 Ariz. 519, 524 (1987).

       [8] For purposes of this analysis, the Court has considered the parties' "contract" to include not only the Enrollment Agreement, but also the Parent Manual that was provided to Plaintiff prior to enrollment.

the Enrollment Agreement are primarily a series of disclosures intended to inform the parents and students "of the inherent risks and voluntary participation in the activities of SRA." (Doc. 1 at 127). It contains few, if any, express promises by SRA that could serve as the basis for a contract claim. Likewise, the Parent Manual provides the parents of prospective students with more specific information as it relates to SRA's philosophy, purpose, vision, belief statements, and general policies and procedures, as well as an overview of the program's therapy, workshop, and academic services. (*See* Doc. 1 at 174–215). Like the Enrollment Agreement, the Parent Manual lacks specific promises that could support a claim sounding in contract. The parties' contract "is nothing more than a general promise which encompasses the basic duty imposed by law to provide reasonably competent [therapeutic] services" and "clearly lacks the specificity required for a breach of contract action." *Collins*, 189 Ariz. at 395; *see also Towns v. Frey*, 149 Ariz. 599, 601 (Ct. App. 1986) ("[T]he contract relied upon must itself contain an undertaking to do the thing for the nonperformance of which the action is brought.").

It follows that the gravamen of Plaintiff's contract-related allegations is *not* that Defendant SRA failed to perform a "special contractual agreement or undertaking," *see Barmat*, 155 Ariz. at 524, but rather that Defendant SRA generally failed to provide Plaintiff and her Daughter with the therapy and academic services that were promised. Plaintiff contends that Defendant SRA failed to satisfy its duties under the parties' contract in numerous ways. For example, Plaintiff alleges that Defendant SRA publicly disclosed certain confidential information; subjected Plaintiff and her Daughter to public ridicule, shaming, violence, yelling, and abuse; denied Plaintiff's participation in family therapy; cut off or otherwise impeded Plaintiff's ability to communicate with her Daughter; denied medical care to Plaintiff's Daughter; impeded the educational progress of Plaintiff's Daughter; staffed its program with unqualified and uncertified therapists; provided services that failed to comply with Arizona law; and otherwise failed to provide "good quality child care, schooling, family therapy and education, boarding services in a safe, nurturing environment, [and] evidence-based family therapy and a college prep curriculum." (Doc.

1 at 109–14). None of these allegations relate to a specific contractual promise made by SRA. As Defendant SRA puts it, Plaintiff simply asserts violations of professional and legal standards that are "based upon the obligations that behavioral health and educational professionals owe generally to a class or the public at large as a result of their professional standing and *not* solely because of a contractual duty." (Doc. 115 at 12–13 (emphasis added)). Likewise, neither Plaintiff's Complaint nor her summary judgment briefing identify a specific contractual provision that was violated.

Rather than bolstering her contract claims, Plaintiff's Response brief seems to lean into the idea that her claims sound in tort. Plaintiff discusses certain duties and standards of care that were imposed on Defendant SRA by virtue of the parties' "special" and/or "fiduciary" relationship, as well as duties and standards of care arising from statute and caselaw. (*See* Doc. 152 at 7–12). This includes a general duty of care, a duty to comply with certain professional standards, a duty to protect the confidentiality of therapy participants, and a duty to refrain from custodial interference. (*Id.*). None of these duties expressly arise from the parties' contract. At times, Plaintiff's apparent adoption of a tort theory is even more conspicuous. For example, Plaintiff asserts that her claim for breach of the implied covenant of good faith and fair dealing is both a contract claim *and* a tort claim, with its basis in tort being founded on the parties' "special relationship." (*Id.* at 7–8). Later, Plaintiff asserts that her "claims against [Defendants] for fraud and breach of confidentiality necessarily triggers a finding pursuant to statute that the conduct of [Defendants] is unprofessional and a violation of a duty *giving rise to tort claims* for constructive fraud and breach of the covenant of good faith and fair dealing, *beyond that associated with the written contract* and negligence." (*Id.* at 9–10 (emphasis added)).

In sum, the Court agrees with Defendant SRA that Plaintiff has failed to demonstrate a basis for her breach of contract and breach of warranty claims, as well as her breach of the implied covenant claim to the extent it is brought under a contract theory. Under the parties' contract, Defendant SRA promised only to provide certain therapeutic and academic services to Plaintiff and her Daughter, a promise that it fulfilled. "That [SRA]

may have done so in a negligent manner, in violation of the duty imposed on [it] by law [to provide services] in accordance with the applicable standard of care, does not change the gravamen of the action from tort to contract." *Collins*, 189 Ariz. at 395. The Court grants summary judgment to Defendant SRA on Plaintiff's contract claims.

As a final note, Plaintiff's Complaint does not specify whether her breach of the implied covenant claim is based in tort or contract. (Doc. 1 at 112–14). As this Court just found above, this claim is dismissed to the extent it is based in contract. That said, Plaintiff argues in her Response that the claim should survive summary judgment as a tort claim. In *McAlister*, the Arizona Court of Appeals explained covenant of good faith and fair dealing and when a breach of that covenant may provide the basis for tort damages:

> The law implies a covenant of good faith and fair dealing in every contract. This implied covenant prevents either party from acting 'to impair the right of the other to receive the benefits which flow from their agreement.' While the remedy for breach of this implied covenant is ordinarily by action on contract, in certain circumstances 'the beach may provide the basis for imposing tort damages.' However, *a 'special relationship' must exist in order to support a tortious breach of the implied covenant of good faith and fair dealing*. Such a relationship is characterized either by a fiduciary relationship, elements of public interest (*e.g.*, unequal bargaining positions), or adhesion.

*McAlister*, 171 Ariz. at 213 (citations and alterations omitted). Here, Plaintiff asserts that a special relationship existed by virtue of Defendant SRA's role as a therapy and residential behavioral health provider. Defendant SRA does not dispute the existence of a special relationship, and the Court will proceed under the assumption that it exists.

Defendant SRA instead argues that Plaintiff has failed to provide evidence—namely, expert witness testimony—demonstrating that Defendant SRA failed to meet the applicable standard of care and caused some injury to Plaintiff. (Doc. 115 at 11–12). As noted above, Plaintiff's tort theory is based on her allegation that Defendant SRA failed to provide the therapeutic and academic services that complied with Arizona law and that were promised to her by the documents provided and discussions she had with SRA

18

representatives prior to enrolling her Daughter. Defendant is correct that expert testimony is generally required to evidence "the accepted conduct of the profession and the defendant's deviation from that standard." *Valencia v. United States*, 819 F. Supp. 1446, 1463 (D. Ariz. 1993) (citing *Peacock v. Samaritan Health Serv.*, 159 Ariz. 123 (Ct. App. 1988)). The only exception is where "the negligence is so grossly apparent that a layman would have no difficulty in recognizing it." *Id.* (citing *Peacock*, 159 Ariz. at 123).

In response to Defendant's argument, Plaintiff asserts that her "claims against [Defendants] for fraud and breach of confidentiality necessarily triggers [sic] a finding pursuant to statute that the conduct of [Defendants] is unprofessional and a violation of a duty giving rise to tort claims for constructive fraud and breach of the covenant of good faith and fair dealing, beyond that associated with the written contract and negligence, *and require no expert testimony*." (Doc. 152 at 9–10 (emphasis added)). Plaintiff does not support this assertion with any caselaw or other legal authority, and this Court's own review of the relevant law did not reveal such an exception to the requirement that a plaintiff provide expert testimony. Rather, the only exception is where the negligence is "so grossly apparent" that a layman could recognize it. *See Valencia*, 819 F. Supp. at 1463. Plaintiff does not meaningfully demonstrate how the present case fits within this exception, and instead makes the conclusory assertions that SRA's conduct "is so egregious and unethical that the guidance of an expert is superfluous" and that "[t]he alleged negligence is so 'grossly apparent' that a layman would have no difficulty recognizing it." (*Id.* at 10).

Aside from arguing these two exceptions, Plaintiff makes no other efforts to respond to Defendant's argument that Plaintiff lacks the necessary expert testimony to support her tort claim. Plaintiff apparently has three experts to support her claims, but one would not know that from reading her Response as it fails to even mention these experts, let alone point the Court to a place in their reports where the experts opine as to the standard of care, whether and how Defendant SRA breached that standard, or how such a breach caused the harm to Plaintiff. It is not this Court's job to sort through hundreds of pages of expert reports in search of the evidence supporting Plaintiff's claim. *See Keenan v. Allan*, 91 F.3d

1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)) ("It is not our task, or that of the district court, to scour the record in search of a genuine issue of triable fact. We rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment."). Moreover, Plaintiff did not even include the export reports in the exhibits she submitted to the Court. (*See* Docs. 127 & 142). Instead, the Court was only able to review the expert reports by referring to the exhibits submitted by Defendants. (Docs. 116-3, 116-4, & 116-5). All told, Plaintiff has not made any meaningful demonstration that she would be able to offer expert evidence at trial concerning the relevant standard of care, whether Defendant SRA breached that standard, and how such a breach caused her harm. The Court grants summary judgment to Defendant SRA on Plaintiff's implied covenant claim to the extent it is brought as a tort.

Aside from Plaintiff's claim for negligence *per se*—which is discussed below—the Court need not consider whether Plaintiff has demonstrated sufficient evidence to support any additional tort claims against Defendant SRA, such as a malpractice or general negligence claim, because Plaintiff's Complaint does not contain any other tort claims. Although Plaintiff appears to argue for such additional tort liability in her briefing, "[i]t is impermissible to add a new claim at the summary judgment stage." *Buckhorn v. Hettinger*, 800 Fed. Appx. 542, 543 (9th Cir. 2020). In sum, the Court grants summary judgment in all Defendants' favor with respect to Plaintiff's claims for breach of contract, breach of warranty, and contractual and tortious breach of the implied covenant of good faith and fair dealing. These claims are dismissed.

### C. RICO Claim

"To prevail on a civil RICO claim the plaintiffs must show, among other elements, a 'pattern of racketeering activity.'" *All Direct Travel Servs., Inc. v. Delta Air Lines, Inc.*, 120 Fed. Appx. 673, 675 (9th Cir. 2005) (quoting 18 U.S.C. § 1962). "'Racketeering activity' is any act indictable under several provisions of Title 18 of the United States Code." *Rothman v. Vedder Park Mgmt.*, 912 F.2d 315 (9th Cir. 1990) (citing 18 U.S.C. § 1961). This includes the four predicate acts alleged by Plaintiff in this case: wire fraud,

illegal monetary transactions from unlawful activity, witness tampering, and witness retaliation. *See* § 1961(1)(B).

Defendants—including Defendant Borges—argue that Plaintiff has failed to develop any evidence to support any of these four predicate acts. (*See* Doc. 113 at 10 ("Plaintiff's RICO claim fails because she has not developed any admissible evidence to establish that Borges personally engaged in any of the federal crimes upon which the RICO claim is based."); Doc. 115 at 13 ("None of [Plaintiff]'s disclosed experts support any of those claims. Nor has Plaintiff produced any evidence or made any specific allegations that would meet the threshold requirements for any of these four categories of criminal activity by any of the Defendants.")). In her Responses, Plaintiff entirely fails to put forth *any* evidence that any of the Defendants committed wire fraud, illegal monetary transactions, witness tampering, or witness retaliation.[9] Plaintiff fails to even point the Court in the direction of such evidence in the record. Rather, the *entirety* of Plaintiff's responsive argument on the "pattern of racketeering" element is as follows:

> The RICO cause of action arises from conduct related to wire fraud, (18 U.S.C. § 1343), illegal monetary transactions from unlawful activity (18 U.S.C. § 1957), witness tampering (18 U.S.C. § 1512) and retaliation against a witness (18 U.S.C. § 1513). As alleged in her Complaint, had defendants not been so misleading, Ms. Sweidy would never have had to invest in attorneys' fees to defeat their attempts to abuse the court process to keep her daughter confined and mentally abused. She would never have had to hire experts to consult and learn what really went on inside SRA and would not have had to give up all rights to her child and child support in a "Hail Mary"

---

[9] In her Response to Defendant Borges' Motion, Plaintiff begins by asserting that Defendant Borges failed to meet her burden of production because she provided no support for her argument against Plaintiff's RICO claim. (Doc. 154 at 11). Thus, Plaintiff contends that the burden of production remains with Defendant Borges. (*Id.*). The Court is unpersuaded. "[T]o carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim . . . or *show that the nonmoving party does not have enough evidence of an essential element* to carry its ultimate burden of persuasion at trial." *Nissan Fire*, 210 F.3d at 1102 (emphasis added). Here, Defendants did the latter by identifying an essential element (the "pattern of racketeering activity" element) and showing that Plaintiff lacked evidence to support it.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> legal maneuver to get her child out of SRA and back in California.

(Docs. 152 at 12–13 & 154 at 12). In both Responses, Plaintiff immediately shifts focus to the "damage to business or property" element. (*See* Docs. 152 at 13 & 154 at 12–13).

Plaintiff's responsive argument does little to assist the Court in identifying whether she has sufficient evidence to support the "pattern of racketeering" element of her RICO claim. The evidence submitted by the parties in this case spans hundreds if not thousands of pages; Plaintiff's Responses alone are supported by 133 separate exhibits. This Court does not have the time nor the resources to parse through such an extensive factual record and piece together the evidence Plaintiff has to support her claims. *See Keenan*, 91 F.3d at 1279 (quoting *Richards*, 55 F.3d at 251) ("It is not our task, or that of the district court, to scour the record in search of a genuine issue of triable fact. We rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment."); *see also Marceau v. Int'l Brotherhood of Elec. Workers*, 618 F. Supp. 2d 1127, 1140 (D. Ariz. 2009) ("A district court is not required to probe the record in search of a genuine issue of triable fact."); *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 405 (6th Cir. 1992) ("[The nonmoving party's] burden to respond is really an opportunity to assist the court in understanding the facts. But if the nonmoving party fails to discharge that burden—for example, by remaining silent—its opportunity is waived and its case wagered."). Given Plaintiff's failure to adequately respond with meaningful evidence to support her RICO claim at this summary judgment stage, the Court must grant summary judgment to Defendants on this claim.

### D. Negligence *Per Se* Claim

"A person who violates a statute enacted for the protection and safety of the public is guilty of negligence *per se*." *Alaface v. Nat'l Invest. Co.*, 181 Ariz. 586, 596 (Ct. App. 1994) (citations omitted). Here, Plaintiff alleges a negligence *per se* claim based on Defendants' purported violations of (i) A.R.S. § 13-1302(A)(1) and (ii) the Arizona Administrative Code. (Doc. 1 at 118–19).

22

First, the Court grants summary judgment in Defendants' favor on Plaintiff's negligence *per se* claim to the extent it is based on violations of the Arizona Administrative Code. The law is clear that in order for a statute or regulation to serve as the basis for a negligence *per se* claim, it "must proscribe certain or specific acts." *Hutto v. Francisco*, 210 Ariz. 88, 91 (Ct. App. 2005) (citation and quotation marks omitted). "Therefore, if a statute defines only a general standard of care, negligence *per se* is inappropriate." *Id.* (citation and quotation marks omitted). Most of the provisions of the Arizona Administrative Code referred to by Plaintiff are intended to define a general standard of care for healthcare providers. Although some could plausibly be considered to "proscribe certain or specific acts"—*e.g.*, A.R.S. § 32-3283, which proscribes a licensee from "divulg[ing] information that is received by reason of the confidential nature of the behavioral health professional-client relationship," (*see* Doc. 154 at 8)—it is not clear that these provisions are also intended to protect the public. For example, the confidentiality privilege provided under § 32-3283 was not enacted for the protection and safety of the public, but rather to encourage clients "to be candid with his or her mental health professional." *In re MH2019-004895*, 249 Ariz. 283, 288 (Ct. App. 2020). This case is now at the summary judgment stage and Plaintiff's Response needed to do more than premise her negligence *per se* claim on a vague, generalized assertion that Defendants violated numerous provisions of the Arizona Administrative Code. Plaintiff failed to demonstrate that her negligence *per se* claim is based on a violation of a *specific* provision(s) of statute or regulation that both proscribes certain or specific acts *and* is intended to protect the safety of the public.

Second, the Court will also grant summary judgment to Defendants on Plaintiff's negligence *per se* claim to the extent it is premised on a violation of § 13-1302(A)(1). Section 13-1302(A)(1), which is part of the criminal code, provides that:

> A person commits custodial interference if, knowing or having reason to know that the person has no legal right to do so, the person . . . [t]akes, entices or keeps from lawful custody any child . . . who is entrusted by authority of law to the custody of

1  another person or institution.

2  Plaintiff alleges that Defendants committed custodial interference by denying her access to

3  her Daughter by monitoring their mail and phone calls, limiting their in-person visits, and

4  otherwise cutting off all contact between them. (Doc. 1 at 118–19). In seeking summary

5  judgment, Defendant Borges argues that § 13-1302(A)(1) was not enacted for public safety

6  purposes, but rather "to stem the flood of child-stealing acts often attendant to domestic

7  relations cases." (Doc. 113 at 13 (quoting *State v. McLaughlin*, 125 Ariz. 505, 507 (1980))).

8  The remaining Defendants join in Defendant Borges' argument. (Doc. 115 at 14). In her

9  Response, Plaintiff argues that § 13-1302(A)(1) is intended to protect children, which she

10  asserts "is a public safety issue [] rooted in safeguarding the interests of those who have

11  their best interest at heart, their parents." (Doc. 154 at 14).

12  The Court is unpersuaded by Plaintiff's argument. First, Plaintiff fails to cite any

13  caselaw or other legal authority to support her interpretation of the purpose underlying

14  § 13-1302.[10] Second, this Court's own review of relevant caselaw reveals that § 13-1302

15  is not concerned with public safety in the manner that is necessary for the statute to serve

16  as the basis of a negligence *per se* claim. Rather, the statute is intimately tied up with issues

17  of domestic relations and custodial arrangements, concerns that have no direct effect on

18  the safety of the general public. *See McLaughlin*, 125 Ariz. at 507 ("The purpose of the

19  charging statute was to stem the flood of child-stealing acts often attendant to domestic

20  relations cases."); *State v. Wilhite*, 160 Ariz. 228, 230 (Ct. App. 1989) ("The essential

21  concern of § 13-1302 . . . is [] to discourage interference with custodial arrangements

22  established by law."). The Court grants Defendants' request for summary judgment on

23  Plaintiff's negligence *per se* claim.

24  ///

25

26  [10] *Troxel*, the only case cited by Plaintiff, does not deal with § 13-1302. Although
that case discusses the interest that parents have in the care, custody, and control of their

27  children—recognizing it as a "fundamental liberty interest"—the case says nothing about
whether a statute concerning custodial interference is intended to protect public safety. *See*

28  *Troxel v. Granville*, 530 U.S. 57 (2000).

### E.  IIED Claim

"As to a claim for [IIED], a plaintiff must establish (1) the conduct of defendant was 'extreme' and 'outrageous,' (2) defendant intended to cause emotional distress or recklessly disregarded the near certainty that such conduct would result from his conduct, and (3) severe emotional distress did occur as a result of defendant's conduct." *Day v. LSI Corp.*, 174 F. Supp. 3d 1130, 1158 (D. Ariz. 2016) (citing *Citizen Publ'g Co. v. Miller*, 210 Ariz. 513, 517 (2005)). Defendant Borges argues that Plaintiff lacks sufficient evidence to create a dispute of material fact with respect to any of these elements. (Doc. 113 at 14–17). The remaining Defendants argue that Plaintiff lacks sufficient evidence to satisfy the first and third elements. (Doc. 115 at 14–15).

With respect to the third element specifically, Defendants—including Defendant Borges—point out Plaintiff's previous assertions that Defendants' alleged acts caused her to suffer only "garden variety" emotional harm. (Docs. 113 at 16 & 115 at 15). Indeed, in the parties' October 27, 2022 Joint Motion for Discovery Dispute Resolution, Plaintiff stated that "[r]egarding [her] claims for . . . pain, suffering, humiliation, etc. (list not exhaustive) damages, these are 'garden variety' damages, stemming directly from Defendants' actions." (Doc. 78 at 5). On December 6, 2022, in opposing Defendants' Motion for an Order Compelling Plaintiff to Undergo a Rule 35 Psychological Examination, Plaintiff asserted the following:

> Plaintiff has no mental condition in controversy. No good cause exists for a psychological examination. Plaintiff leads a productive, healthy and fulfilling life. She is fortunate to be free of physical and/or psychological ailment. She is highly educated, and her circumstances allow her to devote countless hours to pro bono, charitable and philanthropic causes. She enjoys rewarding relationships with friends and family. She enjoys hobbies including hiking, sewing, playing the piano and writing music and poetry. On Saturday mornings, she is at Zumba classes given by the City of Palo Alto. Plaintiff is on no medication. Plaintiff does not drink alcohol, smoke marijuana or take illegal drugs. After a recent root canal, Plaintiff took 200 mg (one tablet, over the counter) of Ibuprofen per day for three days.

(Doc. 93 at 8–9). Later in the same response, Plaintiff stated that she "claims pain, suffering, humiliation and inconvenience" and that "[t]hese are 'garden variety' damages that anyone would suffer in the same situation." (*Id.* at 10).

Courts have consistently recognized that assertions of "garden variety" emotional damages are inconsistent with a claim for IIED. *See, e.g.*, *Hupp v. San Diego Cnty.*, No. 12cv0492 GPC(RBB), 2013 WL 5408644, at *7 (S.D. Cal. Sept. 25, 2013) (emphasis added) ("By alleging a claim for [IIED] and seeking damages for mental and emotional injuries, Hupp is seeking *more than* garden-variety emotional distress damages."); *Lira v. Chipotle Mexican Grill, Inc.*, No. 17-cv-02588-JSW (KAW), 2018 WL 2128707, at *3 (N.D. Cal. May 9, 2018) (emphasis added) ("In turn, 'garden-variety' emotional distress has been defined as 'ordinary or commonplace emotional distress' or that which is 'simple or usual.' . . . Emotional distress that is *not* garden-variety 'may be complex, such as that resulting in a specific psychiatric disorder,' *or where there is a claim for [IIED].*"); *Spector v. Bd. of Trs. of Cmty.-Tech. Colls.*, No. 3:06cv129 (JCH), 2007 WL 9753111, at *3 (D. Conn. June 28, 2007) ("A plaintiff making a claim for [IIED] must prove more than 'garden variety' emotional distress. In fact, in order to sustain these claims, plaintiffs must prove that they suffered severe emotional distress.").

In this case, Plaintiff cannot have it both ways. She cannot assert "garden variety" emotional damages in order to avoid a psychological examination during discovery, only to turn around and assert *severe* emotional distress sufficient to support a claim for IIED at the summary judgment stage. Moreover, Plaintiff's Reponses do not address the third element at all. Instead, she focuses *solely* on the first element by citing cases in which courts—none of which are courts from Arizona or the Ninth Circuit—found "that the unilateral separation of a child from its parent *can* be extreme and outrageous conduct." (Docs. 152 at 15–16 & 154 at 14–15). Thus, even if the Court were to overlook Plaintiff's inconsistency on this issue over the course of this litigation, summary judgment in Defendants favor on this claim would nonetheless be appropriate as a result of Plaintiff's failure to respond. *See Garcia v. Salt River Project Agric. Improvement & Power Dist.*,

618 F. Supp. 2d 1092, 1099 (D. Ariz. 2007) (citing LRCiv. 7.2(i)) ("Generally, a party's failure to respond to arguments in a motion 'may be deemed consent to the denial or granting of the motion and the Court may dispose of the motion summarily.'"). The Court grants summary judgment in Defendants' favor on Plaintiff's IIED claim.

### F. Conversion of Property Claim

"Arizona has adopted the following definition of conversion, which is in the Restatement (Second) of Torts § 222A(1) (1965): 'Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel.'" *Miller v. Hehlen*, 209 Ariz. 462, 472 (Ct. App. 2005). "If those elements are shown, a court must then consider the seriousness of the interference and whether the offending party must pay full value." *Id.* (citing Restatement (Second) of Torts § 222A(2)). In this case, Plaintiff's conversion claim is based on her allegation that SRA failed to return certain personal property to Plaintiff after her Daughter was removed from SRA. (*See* Doc. 1 at 123). The property had been delivered by Plaintiff to SRA for use by her Daughter. (*Id.*). Plaintiff asserts that Defendants are liable for the value of the unreturned property. (*Id.*).

The Court will first grant summary judgment to Defendant Borges on the conversion claim. In her separate Motion, Defendant Borges argues, in part, that she never personally exercised control or dominion over the personal property at issue and that Plaintiff has failed to provide any evidence demonstrating otherwise. (Doc. 113 at 17–18). In her Response to Defendant Borges' Motion, Plaintiff offers the same, two-paragraph conversion argument that she uses in her Response to the other Defendants' Motion. (*Compare* Doc. 154 at 15–16 (Plaintiff's Response to Defendant Borges) *with* Doc. 152 at 16 (Plaintiff's Response to other Defendants)). The argument contains no reference to Defendant Borges specifically, let alone any evidence that she *personally* exercised intentional dominion or control over the personal property at issue at any time. The Court grants summary judgment to Defendant Borges as to Plaintiff's conversion claim.

The remaining Defendants argue that "Plaintiff cannot make a claim that the

Defendants 'seriously interfered' with her right to control [her Daughter's] personal belongings or even that she is the rightful owner of those belongings." (Doc. 115 at 15). Defendants explain that Plaintiff "testified in deposition that she did not know if [her Daughter] received the property shipped to her from SRA, would *not* ask her Daughter what she received, and it is "none of your business" whether [Plaintiff] would have forwarded the property to her Daughter if Defendants had instead [] shipped [the property] to her address." (*Id.*). Indeed, when asked at the deposition about the property subject to her conversion claim, Plaintiff stated that the property did not get sent to her house and "that's what I know." (Doc. 116-10 at 3). When asked whether her Daughter received the property at her father's house, Plaintiff responded "I don't know. Ask [my Daughter]." (*Id.*). Later during the deposition, the parties returned to the topic:

> Q: [D]o you know where the property went?
>
> A: I know it did not go to me. I'm assuming that it went to Mr. Stata, but I have no necessarily direct evidence.
>
> Q: Do you know if it went with [your Daughter]?
>
> A: Do I know if it went with [my Daughter]?
>
> Q: Yes. Do you know?
>
> A: Do I—do I know for a fact? Was I there? No, I was not a recipient [sic] witness to whether it went with [my Daughter]. But I can say this. It was boxes and boxes, and there's no way they packed up all that, gave it to [my Daughter], and [my Daughter] then schlepped it home during COVID on the plane on Sunday, the 28th when she flew home in June. I don't believe—
>
> Q: I don't—I'm not saying she surfeited it back on her own back. Obviously, that's not what I meant, ma'am. Don't be deliberately—
>
> A: No, that's not obviously. I'm not deliberately anything. You asked me did it go with [my Daughter]. Well, going with [my Daughter] sounds like [my Daughter]'s leaving and the stuff's going with her.
>
> Q: Do you—did you—have you asked [your Daughter]?

> A: I'm not getting in a conversation with [my Daughter] about those belongings. . . . And I'm not going to bring up things that create nothing [but] animosity and problems thanks to Spring Ridge Academy.

(*Id.* at 6–7). Later during the deposition, Plaintiff expressly acknowledges that SRA did not maintain dominion or control over the disputed property but rather that SRA sent the property to her Daughter:

> What is relevant is that [SRA] sent my belongings to somewhere other than to me. No, I don't agree that . . . minors' belongings belong to the minor and that nor is that something that [SRA] gets to assert. I don't agree with either of those. And you're never going to get me to agree with it.
>
> And if I feel that [the property] belongs to [my Daughter], it's my place to give that to [her], not for [SRA] to preempt me and decide that they know better what possessions my daughter should have than I do. That's exactly what got us into this lawsuit, overstepping boundaries and not fulfilling their contractual obligations to behave in an ethical and appropriate manner vis-à-vis the sponsors . . . and the student.
>
> . . .
>
> [The property] should have been returned to me as I requested, documented, and asked. Should not have been sent anywhere else, and that would have been the end of that. And that's my position.

(*Id.* at 8, 11).

Plaintiff's Response does not offer any evidence—or otherwise refer the Court to some evidence in the record—that supports her conversion claim. Rather, she simply repeats her Complaint allegations that she "never received the property that was under the dominion and control of the Defendants," that she had "demanded its return," that Defendants denied her "the opportunity to physically retrieve the property herself," and that "[n]o evidence has been provided by the Defendants as to what happened to the items." (Doc. 152 at 16). This response from Plaintiff is entirely deficient and does nothing to meaningfully support her conversion claim with evidence. The above-excerpted deposition testimony from Plaintiff—which appears to be the *only* evidence that has been provided to

this Court on this issue—indicates an agreement by all parties that SRA did *not* exercise dominion or control over the property in a manner that seriously interfered with Plaintiff's right to the property. Rather, SRA appears to have reasonably sent the property with and/or to Plaintiff's Daughter when she left SRA for her father's house. On the evidence before this Court, it appears that Plaintiff is merely frustrated that SRA did not comply with or even acknowledge her request that the property be sent to her. Such a grievance does not amount to an actionable conversion claim, and Plaintiff does not offer any meaningful argument or legal support to the contrary. The Court grants summary judgment to Defendants on Plaintiff's conversion claim.

### G. Punitive and Special Damages

Defendants request that the Court deny Plaintiff's request for punitive damages. Defendants correctly assert that, under Arizona law, "[s]omething more than the mere commission of a tort is always required for punitive damages" and that such damages should only be available where "the defendant's wrongful conduct was guided by evil motives." *Rawlings*, 151 Ariz. at 162 (citation omitted). "The evil mind which will justify the imposition of punitive damages may be manifested in either of two ways. It may be found where defendant intended to injure the plaintiff. It may also be found where, although not intending to cause injury, defendant consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others." *Id.* Defendants also request that the Court deny Plaintiff's request for certain special damages, arguing that the special damages claims lack a cognizable legal basis, that Plaintiff lacks standing, and that the claims lack sufficient evidentiary support. (Doc. 115 at 17).

Given the Court's denial of summary judgment on Defendants SRA and Kate Deily's potential liability for the fraud claims, the Court declines to rule on punitive or special damages at this time. In the event that Plaintiff is entitled to damages, the parties will have the opportunity to assert their positions and provide supporting argument.

///

///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IV.  **CONCLUSION**

Accordingly,

**IT IS ORDERED** that Defendants' requests for Joinder (Docs. 118, 119, 162, & 163) are **granted**.

**IT IS ORDERED** that Defendant Veronica Borges' Motion for Summary Judgment (Doc. 113) is **granted**. All claims against Defendant Borges are **dismissed with prejudice** and Defendant Borges is dismissed from this action.

**IT IS FURTHER ORDERED** that Defendants Spring Ridge Academy, Jean Courtney, Suzanne Courtney, Brandon Courtney, Erin Smith, Leslie Filsinger, Justin Zych, and Kate Deily's Motion for Summary Judgment (Doc. 115) is **granted in part**. All claims against Defendants Jean Courtney, Suzanne Courtney, Brandon Courtney, Erin Smith, Leslie Filsinger, and Justin Zych are **dismissed with prejudice**. Defendants SRA and Kate Deily's request for summary judgment is **denied** with respect to Plaintiff's actual, constructive, and consumer fraud claims, but **granted** with respect to all other claims. Thus, only Defendants SRA and Kate Deily remain, and the only remaining claims are Plaintiff's fraud claims (Counts I and II).

Dated this 15th day of August, 2023.

Honorable Steven P. Logan
United States District Judge